1

```
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,     : 17-CR-00177(ENV)
4                                  :
                                   :
5                                  :
          -against-               : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
                                   : Thursday, November 7, 2019
8    BLAISE CAROLEO,               : 2:30 p.m.
                                   :
9          Defendant.              :
                                   :
10
     - - - - - - - - - - - - - X
11
         TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12             BEFORE THE HONORABLE ERIC N. VITALIANO
               UNITED STATES DISTRICT COURT JUDGE
13
                       A P P E A R A N C E S:
14
     For the Government:  RICHARD P. DONOGHUE
15                        United States Attorney
                          Eastern District of New York
16                            271 Cadman Plaza East
                              Brooklyn, New York 11201
17                        BY:ERIN ARGO, ESQ.
                              ALICIA WASHINGTON, ESQ.
18                            Assistant United States Attorney

19   For the Defendant:   MARION A. SELTZER
                              1725 York Avenue
20                            New York, New York 10128
                          BY:MARION A. SELTZER, ESQ.
21                        BY:SHELBY SULLIVAN-BENNIS, ESQ.

22
     Court Reporter:  Michele D. Lucchese, RPR, CRR
23                    Official Court Reporter
                      E-mail:  MLuccheseENDY@gmail.com
24
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

Proceedings                                                    2

1          THE COURTROOM DEPUTY:  All rise.  Court is now open.

2    The Honorable Eric N. Vitaliano presiding.  Case on the

3    calendar is USA versus Caroleo, case number 17-CR-167, on for

4    a pretrial conference.

5          Will the attorneys please note their appearance

6    beginning with Government counsel.

7          MS. ARGO:  Good morning, Your Honor.  Erin Argo and

8    Alicia Washington for the United States.

9          THE COURT:  Good afternoon.

10         MS. SELTZER:  Good afternoon, Judge, my client is

11   present.

12         THE COURTROOM DEPUTY:  Note your appearances.

13         MS. SELTZER:  Marion Seltzer for the defendant

14   Blaise Caroleo.

15         SULLIVAN-BENNIS:  And Shelby Sullivan-Bennis.

16         THE COURT:  Good afternoon as well, and to Mr.

17   Caroleo.

18         THE COURTROOM DEPUTY:  Counsel for both sides are

19   present, and defendant.

20         THE COURT:  Good afternoon to you all.  We are here

21   for the final pretrial conference before trial.  The

22   Government has filed in limines.  So, Ms. Argo, I will let you

23   set the agenda.  And, Ms. Seltzer, if you have things to add

24   to that agenda when the Government has finished, we will turn

25   to that and take care of anything else that needs to be taken

Proceedings                                                3

1    care of.

2               MS. ARGO:  Thank you, Your Honor.

3               THE COURT:  You can pick your order.

4               MS. ARGO:  Thank you, Your Honor.  My colleague, Ms.

5    Washington, may sort of interject, if that is all right.

6               THE COURT:  That is fine.  That is fine on both

7    sides.

8               MS. ARGO:  Thank you, Your Honor.

9               With respect to the messages contained within the

10   extraction reports that the Government intends to be in

11   evidence in this trial, they do contain some uncharged conduct

12   and in addition to that, there are also text messages between

13   the actual victims and the defendant.  In relation to those

14   conversations, clearly the defendant's own statements are

15   admissions and they are non-hearsay under 801(d)(2) and with

16   respect to the responses --

17              THE COURT:  Let's do this in two parts.  Let's

18   assume for purposes of this part of the motion that everything

19   you just said is gospel and we are ready to go.  Where are we

20   go with the size?  There are thousands of these things.  What

21   does the Government think its game plan is with respect to the

22   exhibits that they want to use at trial?

23              MS. ARGO:  So with respect to the exhibits that the

24   Government is going to use at trial --

25              THE COURT:  You propose to use.

```
                        Proceedings                    4
```

1          MS. ARGO:  That we propose to use, yes, Your Honor.

2     -- there are several excerpts from the actual larger phone

3     reports that we have, in fact, already prepared as sort of

4     little excerpts from that same exhibit so that it kind of --

5     taken into smaller pieces with respect to this uncharged

6     conduct.

7          THE COURT:  Some of the smaller pieces that I was

8     reviewing with Mr. Herman went on for pages and pages and

9     pages.

10          MS. ARGO:  Your Honor --

11          THE COURT:  Over days, weeks, and months.

12          MS. ARGO:  Yes, Your Honor.  These conversations,

13     the Government does not intend for those to be read allowed in

14     their entirety.  In some instances, the Government has

15     presented only just a one-page statement.  And with respect to

16     the ones that are 10 pages long, in no shape or form does the

17     Government intend to read those allowed from beginning to end.

18     There are certain portions within those sub-exhibits that the

19     Government would seek to simply read back and forth briefly to

20     the jury.

21          THE COURT:  So I got the impression that some of

22     those impressions were a lot longer than ten pages.  Did I

23     have a misimpression?

24          MS. ARGO:  The full reports, Your Honor, the full

25     extraction reports are voluminous.

Proceedings                                          5

1        THE COURT:  I know the full reports go on forever

2  and ever.  This only goes on for a year and a day.

3        MS. ARGO:  So with respect to the other sub-exhibits

4  that we have pulled, they are actually about 10 pages.  I

5  don't believe, as I'm thinking about this right this minute,

6  that there are any in excess of 10 pages from those.  Perhaps

7  they might be one that is 15.  I have them here as well.

8        THE COURT:  I think they are in the 400?

9        MS. ARGO:  There are two chats, Your Honor, one with

10  a third-party.

11        THE COURT:  Correct.

12        MS. ARGO:  Which is actually --

13        THE COURT:  That's the one that I was thinking

14  about.

15        MS. ARGO:  So, yes, there is one conversation in

16  which the defendant engages in the trading of child

17  pornography.  That conversation does go on for some bit.

18  Again, we are not intending to read the entire conversation.

19  There are certain portions --

20        THE COURT:  We will cut to the chase.  You are going

21  to chop it down.

22        MS. ARGO:  Yes, Your Honor.

23        THE COURT:  It is not going to the jury for pages

24  and pages and things that start in October and end in January.

25        MS. ARGO:  Okay.

Proceedings                                                    6

1          THE COURT:  It's cumulative and it's not happening.

2          MS. ARGO:  Yes, Your Honor.

3          THE COURT:  So you can start chopping it down and

4    submit a copy to Ms. Seltzer and we will hear from -- again,

5    that was not to prejudge, Ms. Seltzer, your argument that none

6    of it is admissible, but I wanted to get to the size first,

7    because in reading them yesterday with Mr. Herman, and it is

8    highly repetitive.

9          MS. ARGO:  Yes, Your Honor, we can certainly cut

10   those down and actually provide additional sub-exhibits from

11   the report.

12         THE COURT:  They are not going to be read at trial

13   and they are not going into the jury room.

14         MS. ARGO:  Understood, Your Honor.

15         THE COURT:  Okay.

16         MS. SELTZER:  May I be heard, Your Honor?

17         THE COURT:  Let's turn to you, Ms. Seltzer, your

18   position, I assume is that none of it should go in at all.

19         MS. SELTZER:  Well, I think there are two issues

20   here.  As I say, I received some documents yesterday on a disc

21   and I received two lengthy sets of material today.  Yesterday

22   I was reviewing 3500, so I have not gotten to whatever it is

23   that is --

24         THE COURT:  We got to the disc.  That is how we

25   know.

MDL      RPR      CRR      CSR

Proceedings                                                    7

1          MS. SELTZER:  So I think there are two issues:  The

2     first is statements by others, not Mr. Caroleo, which are

3     hearsay.  First of all, they are hearsay.  Second, there's no

4     proof that I am aware of that the others are necessarily

5     minors.

6          THE COURT:  The ones we are just simply talking now,

7     there is no representation that they are.  This relates to, I

8     assume, the receipt and distribution counts.

9          MS. ARGO:  So there are, in fact, conversations that

10    take place with adults and the only conversations that take

11    place with adults the Government seeks to introduce are any

12    instance where either the defendant is, in fact, trading child

13    pornography or he is boosting about the fact that he is

14    receiving child pornography from minors.  Other than that, the

15    Government is actually saying these conversations did, in

16    fact, take place with minors, the remainder of those

17    conversations, Your Honor.

18         THE COURT:  Those are the third-party ones -- I am

19    thinking of the trading one.

20         MS. ARGO:  Yes, Your Honor.

21         THE COURT:  There is no representation that that was

22    with a minor, is there?

23         MS. ARGO:  No, Your Honor.  Those we believe to be

24    with an adult, two adults.

25         MS. WASHINGTON:  Right.  Just so the record is

Proceedings                                          8

1    clear, those two chats are -- the two chats in which the

2    defendant is trading child pornography with other adults, that

3    is 402-K.  That's an chat with an individual named Ben Brink.

4    And then there is 402-L and that chat is actually charged

5    conduct.  That is the actual parts of Counts One, Two and

6    Three.

7            THE COURT:  And refresh me again, those are the

8    receipt and distribution counts?

9            MS. ARGO:  Yes, Your Honor.

10           MS. WASHINGTON:  Correct.

11           And then there is one chat that is Government

12   Exhibit 402-N, and that is text messages in which the

13   defendant is bragging about receipt of child pornography.

14           THE COURT:  Right.

15           MS. SELTZER:  Your Honor, to be honest, I have not

16   seen 402-N.  I have read some reports about it, but I have not

17   had the opportunity yet to examine these exhibits.  So to some

18   extent, I am at a lost.  They were provided to me yesterday.

19           MS. ARGO:  Your Honor, just to be clear, as far as

20   where these exhibits are coming from, they are coming from

21   documents that have been in Ms. Seltzer's possession for quite

22   some time and they are searchable.  So if there are any words

23   or particular names or anything, a keyword that Ms. Seltzer

24   would like to search within those documents that we provided,

25   they are completely searchable.

Proceedings                                           9

1          MS. SELTZER:  Now that I know the name Tolendini in

2     the 48,000 pages.

3          THE COURT:  Either that, she would have need a Ouija

4     board.

5          MS. SELTZER:  As I say, I know what the report --

6     the 3500 says about Mr. Tolendini.  From what I know, I do not

7     believe the Government has met a threshold showing that

8     support its argument by reading the message, which I only have

9     the 3500 material from the agent or from whatever -- from Mr.

10    Tolendini.  I haven't actually seen the message.

11         MS. ARGO:  Your Honor --

12         MS. SELTZER:  If he doesn't testify, I suggest it's

13    hearsay.

14         MS. ARGO:  May I respond to that, Your Honor?

15         THE COURT:  Yes, please.

16         MS. ARGO:  With respect to any statements from

17    third-parties in relation to a text message or a chat

18    conversation with the defendant, as previously stated,

19    801(d)(2) makes his statements, the defendant's statements

20    admissible, but also third-party statements, and there is tons

21    of case law on this, Your Honor, which we cited in our brief,

22    that third-party statements do come in to make clear the

23    context of the defendant's statements, to shed light on the

24    defendant's own mental state, to understand the effect of

25    those statements on the listener, as well as the defendant.

Proceedings                                          10

1    They also come in because they are also uncharged conduct.

2             So with respect to the Mr. Tolendini conversation,

3    Mr. Caroleo actually does distribute child pornography in that

4    chat.  So, to be clear, that is actually uncharged conduct.

5    So under 404(b), this proves motive, intent, preparation,

6    plan, knowledge, identity, absence of mistake or lack of

7    accident.  So that quite clearly falls within the parameters

8    of 404(b)(2).

9             THE COURT:  Be careful.  You are going to have to

10   alert the Court to this, Ms. Argo as we go along.  I agree

11   with all of that, and keeping a road map for what purpose

12   something is coming in.  If it is 404(b), it is coming in with

13   a cautionary instruction that it wouldn't have otherwise.

14            MS. ARGO:  Of course, Your Honor.  We can certainly

15   provide that additional sort of cuing to the Court.

16            THE COURT:  Once we have given the instruction, we

17   can say that is for that purpose.

18            MS. ARGO:  Absolutely, Your Honor.

19            THE COURT:  And there is going to be an agent who is

20   going to describe, I assume, how everything was extracted?

21            MS. ARGO:  Yes, Your Honor.  There is going to be a

22   forensic examiner from the FBI who is going to go through

23   that.

24            THE COURT:  And that gets connected up.  And as I

25   understand it from something I listened to yesterday, there is

Proceedings                                          11

1    no challenge by the defense that these things came off a

2    device that was owned and controlled by Mr. Caroleo.

3              MS. ARGO:  Certainly the Government would state that

4    with respect to the one phone that was seized from his person,

5    we believe that there's going to be an agreement to that

6    effect so we don't have to get into the circumstances of the

7    arrest.

8              THE COURT:  And that is where these text messages

9    come from?

10             MS. ARGO:  Some of them came from that and then some

11   came from devices that were seized within the defendant's

12   home, which brings us to another portion of what we would like

13   to sort of flag for Your Honor and defense counsel, which is

14   that the defendant did make statements in non-custodial

15   interview in which he claimed ownership of the tablet, the

16   fact that he owned a Droid and an HTC phone.  He also

17   identified his own phone number and made numerous admissions

18   about those devices actually being his and that the user name

19   on Kik, Nimfeater belonged to him.  So to the extent those are

20   obviously his admissions, just as the letter that he submitted

21   to the Court in which he waived his attorney-client

22   privilege --

23             THE COURT:  We will get to that later.  Let's keep

24   them all separate.

25             MS. ARGO:  All right.

MDL      RPR      CRR      CSR

Proceedings                                    12

1        THE COURT:  Those statements were made to NYPD?

2        MS. WASHINGTON:  To FBI.

3        THE COURT:  To FBI agents.

4        MS. WASHINGTON:  Yes.

5        MS. ARGO:  We would only be seeking to admit those

6   limited portions of the statement.  There are obviously some

7   false exculpatories and other self-serving statements that are

8   made throughout that.  It is a quite lengthy interview.  We

9   would only be seeking to show the ownership of the devices.

10       MS. SELTZER:  We are not stipulating to that, Your

11  Honor.  We are only stipulating to the device -- the one phone

12  that was seized by the Manhattan DA.

13       THE COURT:  Ms. Argo has cleared that up.  They are

14  going to lay the foundation through Mr. Caroleo's statement to

15  the FBI as to those devices.

16       MS. ARGO:  Yes, Your Honor.

17       THE COURT:  As I understand it.

18       MS. SELTZER:  There are two more Kik chats that are

19  referenced 402-O and 402-P in the exhibit list.  I have not

20  had an opportunity to review those yet.

21       THE COURT:  What are they, Ms. Argo?

22       MS. ARGO:  Yes, Your Honor.  402-O consists of one

23  page.  It is simply I think a three-message chat between the

24  defendant and an individual identified as KateS..001 in which

25  he provides his name, his phone number, where he is located in

Proceedings                                            13

1   a message to this individual.  So it is simply showing

2   attribution, ownership, the fact that it is, in fact, Mr.

3   Caroleo who is using these devices or this particular device.

4           With respect to 402-P, that chat is with another

5   minor.  So that is actually uncharged conduct in which he is

6   soliciting images from this individual and then proceeds to

7   threaten this individual if she does not provide the pictures

8   to him.  Your Honor, it is a little bit lengthy and we are

9   happy to condense that down to its sum and substance, if you

10  will.

11          THE COURT:  Is that person testifying at the trial?

12          MS. ARGO:  No, she will not be testifying at the

13  trial.  However, again under 404(b), this would be uncharged

14  conduct and this is something that would show that there is a

15  lack of mistake, that this is intentional, that this is not an

16  accident, that this is the modus operandi of the defendant.

17          THE COURT:  What is going to be the offer of proof

18  on that?  The agent?

19          MS. ARGO:  It would come in because it's in the

20  devices that we will, I believe, lay the foundation to show

21  that it belongs to the defendant and that this is a

22  conversation that the defendant was having with another

23  individual that an agent has, in fact, identified as a minor.

24          THE COURT:  That is the key piece.

25          MS. ARGO:  Yes.

Proceedings                                                    14

1      THE COURT:  What is the evidence that is coming

2   before the jury that that is the case?

3      MS. WASHINGTON:  The agent will testify, based on

4   her training and experience, that essentially from looking at

5   pictures and images of the chest area of the child, the pubic

6   area of the child indicate that it is, in fact, a minor

7   involved.

8      THE COURT:  So there is a picture attached to that?

9      MS. WASHINGTON:  There are pictures and this is also

10  an individual that the FBI agent has interviewed and met.

11     MS. SELTZER:  Your Honor, I don't mean to get

12  technical, but how is somebody an expert in recognizing the

13  pubic area and chest area of a minor?  We are already getting

14  started with this stuff.

15     THE COURT:  They have to be prepared to lay a

16  foundation for that.  If you want to voir dire them on how

17  they know that.  If they seem to be satisfied at the end of

18  your voir dire that there will be sufficient evidence in the

19  record to satisfy me that there is a basis for their

20  conclusion that that is within their competence.  I think the

21  reality here is going to be, in addition to that, I'm

22  gathering, I think it was Ms. Washington who said, that the

23  agent who is testifying has actually seen the child I assume

24  fully clothed.

25     MS. WASHINGTON:  Yes.  That's correct.

Proceedings                                    15

1        THE COURT:  And it is based on that observation,

2    which law enforcement officers are trained to do, pegs the

3    person as being someone under the age of 18, which doesn't

4    really require great expertise, Ms. Seltzer.  Based on what I

5    am hearing, I assume they are going to be able to lay that

6    foundation assuming the agent testifies the way it has been

7    described.

8        MS. ARGO:  Yes, Your Honor, that would be what the

9    Government intends to do.

10       THE COURT:  It is going to be important, and get

11   them as quickly as you can to Ms. Seltzer and to us, we have

12   jury selection on Monday, to get us your proposed cutdown

13   exhibits and I have a nifty red pen.

14       MS. ARGO:  Absolutely, Your Honor, we will most

15   certainly do that.

16       THE COURT:  I mean, I can't get this Ben text thing

17   out of my mind.  It was just over and over and over.  It was

18   the same conversation.

19       MS. WASHINGTON:  I can say on the record exactly

20   what the Government intends to show and we can cut it down to

21   that portion, which is that at one point the defendant sends a

22   video of one of the Jane Does to this Ben Brink individual.

23   So that is a limited portion that we would like to show.  And

24   then the second piece is --

25       THE COURT:  There was some -- look, listening to it,

Proceedings                                    16

1   there were some that are far more probative than others.

2              MS. WASHINGTON:  Yes.

3              THE COURT:  There is no question about that.  I

4   assume those are the ones you will focus on.

5              MS. WASHINGTON:  That is correct, Your Honor.  And

6   then there is only one other chat that we will probably

7   include.  So we can cull that down.

8              THE COURT:  Yes, because it is just not going to

9   happen.

10             MS. ARGO:  Yes, Your Honor, we can do that.

11             THE COURT:  Is there any other point that you have

12  on that, Ms. Seltzer?  I don't want to cut you off.

13             MS. SELTZER:  No, only the arguments that were made

14  in my memo.

15             THE COURT:  Let's go back, Ms. Argo.  There is

16  another classification, too, is there not, of texts to

17  victims?

18             MS. ARGO:  Yes, Your Honor.

19             THE COURT:  The victims are testifying or not?

20             MS. ARGO:  Yes.  The victims will be -- there are

21  three victims who are named in the indictment and who will be

22  here present testifying, yes, Your Honor.  And then there will

23  be some of these chats that will be gone through with the

24  forensic examiner who actually did the extraction report or

25  examined or peer reviewed the phone report and we will go

Proceedings                                        17

1  through those chats.

2          THE COURT:  Obviously the same restriction.  The

3  couple of the ones that we went over didn't seem anywhere near

4  as long as the one, but there were some that had those

5  multi-date kind of things, which are, to me, a tip off that

6  it's too long.

7          MS. ARGO:  Understood, Your Honor.  We can

8  definitely trim those down.

9          THE COURT:  So you understand.  That is good.

10          MS. ARGO:  We do.  Thank you, Your Honor.

11          THE COURT:  And you have no points with respect to

12  that, Ms. Seltzer?

13          MS. SELTZER:  Nothing further, no.

14          THE COURT:  Keep going then, Ms. Argo.  I know there

15  were other applications.

16          MS. ARGO:  Yes, Your Honor.  So, with respect to

17  what the defendant filed on the docket, that was back in

18  September, I believe, the defendant filed numerous

19  conversations between himself and his attorneys discussing

20  details of the case.  In one such e-mail, which is page 4 of

21  11 in document 72 filed on the public docket, Mr. Caroleo

22  makes a statement that I had 4,000 pictures in my phone, 99.5

23  percent of them were architecture sites, family and pets, less

24  than one percent were of the victims.  That portion of the

25  sentence we believe should come in as an admission by the

Proceedings                                    18

1    defendant.

2           Finally, near the end of that particular e-mail, Mr.

3    Caroleo makes a statement "I am guilty of having pictures of

4    adolescent children and sexting."  I want to say those two

5    statements are admissions of the defendant and because Mr.

6    Caroleo purposefully waived the privilege between an attorney

7    and his client -- I'm sorry, the attorney and her client,

8    those particular admissions should come in and none of the

9    other exculpatory statements and self-serving statements

10   should come in.  I should add -- I'm sorry, Your Honor -- just

11   as with his non-custodial interview as well.

12          MS. SELTZER:  Your Honor, again, I addressed that in

13   my memo.  I think that it is clear that this is a man who is

14   not schooled and certainly did not understand the implications

15   of filing the letter that he filed and the communication that

16   he had had with me and certainly didn't intentionally waive

17   his attorney-client privilege.  It just so flies in the face

18   of that privilege.  I understand the Government's argument.

19   It was not done knowingly.  It was not done knowingly and

20   intentionally.

21          THE COURT:  I will be honest, I was unaware that

22   those letters were actually put on the public file by the

23   clerk, but I am advised that is indeed the normal practice in

24   this electronic age.  In the old days, a letter addressed to a

25   judge would have been put in the mailbox of the judge and that

MDL      RPR      CRR      CSR

1    would have been the only place it would have been disseminated

2    to.

3         I am going to give you both a chance to write a

4    little bit more and if you can get something in by the close

5    of business tomorrow.  It is a very troubling issue.  There is

6    no question that the two excerpts that Ms. Argo has given us

7    are classic admissions and would be admissible clearly.

8         We are obviously dealing with a pro se who is not

9    experienced in the law and the like.  The excerpts that the

10   Government wishes to use really had nothing to do with the

11   purpose that Mr. Caroleo had in sending the letter in the

12   first place.  He was referencing I guess his efforts to

13   continue to try to make a point about how he got remanded on

14   the GPS coordinates, trying to argue that counsel, Ms. Seltzer

15   and her predecessors, for that matter, would not take up the

16   cudgels to argue that this was an example of the Government

17   being vindictive or manipulative and setting him up.  The fact

18   of the matter is that pretrial services doesn't even work for

19   the Government; they work for the Court, number one, and the

20   fact that he was remanded had nothing to do with the

21   coordinates, it had to do with his admission in open court,

22   that he was at the location that he was at.  It did not have

23   to be verified by the GPS coordinates because he admitted

24   where he was.  That is why he got remanded.

25        All of that being said, this aspect of what was set

Proceedings                                                        20

1    forth in the e-mails that were attached to show the other

2    point, there is no connection whatsoever.  That is not what he

3    intended to show when he sent the letter to me to make the

4    other point.

5             I do have some of the concerns that Ms. Seltzer has

6    articulated, which are serious.  There is an argument under

7    504(b) of the Federal Rules of Evidence which would suggest

8    that that inadvertence excuses what otherwise would have been

9    a clear waiver of privilege, because there is no question that

10   he attached the e-mails containing the privilege information.

11   There is no question that he then mailed the letter to someone

12   other than his lawyer, whether it is me or the clerk, it

13   doesn't matter, that is a waiver, whether that is done

14   intentionally, it is a waiver of privilege.  504(b) deals with

15   inadvertence.

16            And 504(d) is essentially a notwithstanding

17   subsection that says the totality of the circumstances,

18   perhaps the conduct that would otherwise be a clear waiver

19   should be disregarded and the privileged information, very

20   much as we do on the civil side and even on the criminal side

21   when we get these terabytes of documents to facilitate a more

22   rapid production of electronically maintained documents, to

23   allow privileged documents to be clawed back.  So you may

24   write simultaneously, if you care to, and the Court will

25   evaluate its position, if you want to give us something by

Proceedings                                    21

1    close of business tomorrow as to whether or not under 504(b)

2    this is an inadvertence that excuses the waiver.  And perhaps,

3    more significantly, depending on the answer to that, whether

4    under 504(d) these are circumstances in which the Court should

5    exercise its power to excuse the waiver.  So we look forward

6    to your writings with respect to that issue.  File it on the

7    docket by close of business tomorrow.

8                MS. SELTZER:  Thank you, Judge.

9                MS. ARGO:  Thank you, Your Honor.

10               MS. SELTZER:  It will be done.

11               THE COURT:  Ms. Argo, I think there is still more on

12   your agenda.

13               MS. ARGO:  Yes, Your Honor.  I believe the other

14   statements that we referenced beyond the statements within the

15   publicly filed document were statements that he made to FBI

16   agents in a non-custodial interview, we would only be seeking

17   to introduce the portions that attribute his ownership of his

18   devices and the ownership of his Kik username and that is

19   truly all that the Government is seeking to admit.

20               THE COURT:  Do you have any view on that, Ms.

21   Seltzer?

22               MS. SELTZER:  No, Judge.

23               THE COURT:  You are a delight to work with, Ms.

24   Seltzer, because you are forthright.  You don't have a

25   legitimate objection and you didn't make one.  The Government

Proceedings                                                    22

1   is right and she has permission to do exactly what she is

2   requesting to do.

3              MS. ARGO:  Thank you, Your Honor.

4              Lastly, I think the only thing left on the

5   Government's motion --

6              THE COURT:  There is one thing I want to raise.  In

7   our scurrying around, more precisely Jonathan's scurrying

8   around, it came up in a case recently, a child pornography

9   case recently before Judge Block where the parties agreed

10  that, notwithstanding any of the other issues in the case,

11  that with respect to the specific images that were going to be

12  used in the case, there was a stipulation that indeed those

13  images qualified as child pornography without having to

14  display the images to the jury.

15             Is there any sense that the parties here would

16  subscribe to the same stipulation?

17             MS. WASHINGTON:  Your Honor, the Government is not

18  prepared to stipulate in this particular case in part because

19  there are the sexual exploitation of minor charges where there

20  are Jane Does who are going to be testifying who are going to

21  need to identify themselves as the minor in those videos.  In

22  this circumstance we don't think it would be appropriate.

23             MS. ARGO:  In addition, Your Honor, we went ahead

24  and took the lead in introducing some limiting factors around

25  introducing this particular child pornography.  We have

Proceedings                                              23

1   limited the images very strictly to just be within the

2   indictment and provide context and only show them for a few

3   seconds.

4           THE COURT:  I was wondering whether we could pursue

5   it or not.  The sexual exploitation counts were a stumbling

6   block.  I was hoping if everybody was interested in doing

7   that, you all could come up with a workaround.

8           MS. ARGO:  Yes.

9           THE COURT:  That is where we sort of stumbled

10  yesterday as well in our thinking process.  I thought I would

11  throw it out and see if the parties were interested.

12  Apparently not.

13          MS. ARGO:  We understand, Your Honor.  We feel we

14  have to meet our burden.

15          THE COURT:  It is an unpleasant task that the jurors

16  will have to perform.  If we can spare them at least that

17  aspect, I was hoping.

18          MS. ARGO:  Understood.

19          THE COURT:  That is not to be.

20          I think there is still even more, is there not?

21  Because that tied in to really is there more because I believe

22  the parties have agreed on a protocol of how these images will

23  be handled.

24          MS. ARGO:  Yes.

25          THE COURT:  We have not discussed that because

Proceedings                    24

1   everybody is on the same page with respect to that.

2              MS. ARGO:  Yes, Your Honor.

3              MS. SELTZER:  That's correct.

4              MS. ARGO:  We have I think two remaining issues.  Is

5   it three?  Sorry.  Right.  So, with respect to specific

6   instances of conduct if the defendant chooses to testify at

7   trial.  There are several instances within the devices that

8   were seized that are instances of lies and deceit that are

9   very specifically attributable to the defendant and

10  demonstrate his character for untruthfulness.  The Government

11  would respectfully request that it be permitted to inquire

12  upon cross-examination regarding those specific instances.

13  That would include attempting to falsify a urinalysis screen

14  with his employer, the use of an opioid substance for which he

15  did not have a prescription, and pretending to be a 19- or

16  17-year-old in certain instances.  Those would all be examples

17  of instances of untruthfulness for which we would seek to

18  cross-examine the defendant if he takes the stand.

19             THE COURT:  Ms. Seltzer.

20             MS. SELTZER:  Well, as I stated again in my letter,

21  I don't anticipate that my client will testify.  I think he

22  understands his rights.  He has been advised of his rights and

23  he has been advised of the charge that the Court will give the

24  jury if he does not testify.

25             THE COURT:  I will.

MDL      RPR      CRR      CSR

Proceedings                                                    25

1        MS. SELTZER:  Our present intention is that he will

2   not testify.

3        THE COURT:  All right.  So we will keep that on the

4   back burner for now, Ms. Argo, and we will address that as we

5   get closer.

6        Mr. Caroleo, to give you a preview, at some point,

7   when it is the defense case, I am going to ask you personally

8   whether it is your intent to testify or not.  Until that time

9   comes, you can continue to work with counsel and make your

10  mind up.

11       THE DEFENDANT:  Thank you, Your Honor.

12       THE COURT:  We are not locking you in.  What Ms.

13  Seltzer said to the Court now does not lock you in to any

14  decision one way or the other.  That is going to be up to you

15  when the time comes.

16       THE DEFENDANT:  Thank you.

17       MS. WASHINGTON:  Two final things.  The last thing

18  in our motion that was filed on Friday, November 1st is with

19  respect to the evidence related to the seizure of the phone,

20  specifically seized from the phone from his person in

21  connection with the assault arrest.  I think the parties have

22  agreed to a stipulation that will cover this issue so we don't

23  need to bring in anyone from the NYPD to testify even in a

24  limited fashion.  I think that is taken care of.

25       THE COURT:  That is fine.  That makes sense.

Proceedings                                              26

1          MS. SELTZER:  That's correct.

2          MS. WASHINGTON:  And the last issue is with respect

3    to a Giglio motion that the Government filed yesterday.  It is

4    standard Giglio disclosures regarding our Jane Does,

5    specifically with respect to travel expenses, which the

6    Government is not seeking to limit any cross-examination about

7    that, that goes to bias, and Ms. Seltzer would be well within

8    her right to cross examine about that, but there is certain

9    information about Jane Doe that we have provided that we

10   believe just -- it does not going to untruthfulness or

11   truthfulness, it would be basically harassment if

12   cross-examination --

13         MS. SELTZER:  Is Jane Doe one of the victims?

14         MS. WASHINGTON:  Yes, Jane Doe Two.  So there are

15   three Jane Does.

16         MS. SELTZER:  Because we have been referring to

17   these people as victim one, victim two, victim three, and then

18   we have first names.  I want to make sure I'm on the same

19   page.

20         MS. ARGO:  The only reference is Jane Doe One

21   through Three in the indictment, and then in our 3500

22   materials and in the exhibits, they are referenced by their

23   first names.  So those are the only two types of ways we have

24   been referring to them.

25         MS. SELTZER:  Okay.

Proceedings                                    27

1          THE COURT:  Do you have any problems with that?

2          MS. SELTZER:  No, I didn't want to see a new Jane

3    Doe appear on the horizon.

4          THE COURT:  That is resolved by agreement.

5          Anything else on the Government side?

6          MS. ARGO:  I believe that is it, Your Honor.  Thank

7    you.

8          THE COURT:  Ms. Seltzer, do you have anything that

9    you --

10          MS. SELTZER:  Just some housekeeping issues.

11          THE COURT:  Yes, please.

12          MS. SELTZER:  I would like to request that the Court

13   permit us to have daily copy.  We have spoken to the court

14   reporter and I think the understanding would be that we would

15   split the cost with the Government and the CJA.

16          THE COURT:  That is your understanding as well Ms.

17   Argo?

18          MS. ARGO:  Yes, Your Honor.

19          THE COURT:  I think it is certainly appropriate and

20   the Court will order it.

21          MS. SELTZER:  My only other request is to know that

22   the schedule.  If we are picking a jury on Tuesday, is it Your

23   Honor's intention to begin on Wednesday or if it takes a

24   shorter time to pick a jury, is it Your Honor's intention to

25   start sometime on Tuesday?

Proceedings                    28

1        THE COURT:  I think we would start on a fresh day.

2   I would think that this is going to be a fairly lengthy voir

3   dire, unless you all think I am wrong.

4        MS. WASHINGTON:  We agree.

5        THE COURT:  In fact, we have ordered, in

6   consultation with some of the people whose hair is even grayer

7   than mine, if that's possible, we have ordered an extra

8   allotment of jurors.  Everyone thinks it will be a long day on

9   Tuesday for jury selection.

10        MS. SELTZER:  Okay.

11        THE COURT:  This way we can take one worry off the

12   worry plate and we will start on Wednesday as a fresh day.

13        MS. SELTZER:  I have been advised that Your Honor

14   does not sit on Fridays; is that correct?

15        THE COURT:  Well, it gets a little squirrelly as we

16   get towards the end of the year.  I am not going to say that

17   to anybody.  Depending on the pace of the trial, it may very

18   well be that if we can rearrange my other calendar and have a

19   half a day on Friday.  So no one should plan on Friday being

20   off.  The only days that anybody should plan on not being here

21   are on Thanksgiving Day and the day after.  I have already had

22   the bad reputation of bringing in a jury on Columbus day.  I

23   don't want to add to my bad reputation to bring somebody in on

24   a Friday after Thanksgiving as well.

25        Trials are what they are.  We will work it as long

Proceedings                                    29

1   as we have to work it.  I think those who have been before me,

2   and unfortunately the reporters know this very well, I can't

3   see the clock so very well.  In fact, I can't see the clock at

4   all.  So five o'clock is not an important number.  It depends

5   on the trial.  If that's helpful for planning purposes.

6              MS. SELTZER:  My only other planning purpose request

7   is that the Government provide me with the order of their

8   witnesses so that we can be prepared for the ones coming each

9   day.  They don't have to do it this second.

10             THE COURT:  They will give you a couple of days in

11  advance.

12             MS. ARGO:  We will do the very best we can on that,

13  Your Honor.  The only issue is, as Your Honor says, the flow

14  of trial.

15             THE COURT:  You never know if somebody has to be in

16  Pittsburgh on Tuesday and now he is on the stand on Monday.

17  Things happen.  We try to accommodate witnesses.  I don't know

18  if you have any out-of-town witnesses coming.  But

19  particularly if they are out of town.

20             MS. WASHINGTON:  We do.  All three Jane Does are.

21             THE COURT:  The Jane Does are, for example, in that

22  case.  Particularly around the holiday season, which also

23  brings us to the weather season.  People may be traveling and

24  if the weather forecast is correct, maybe we will find out if

25  that includes tomorrow, people may have weather issues.  I

Proceedings                                      30

1   guess we just have to keep our feet moving and respond as we

2   need to.  That is the plan.

3            Now that the Government is getting closer to the

4   beginning of trial, what is the Government's current trial

5   time estimate?

6            MS. WASHINGTON:  We estimate about three to four

7   days.

8            THE COURT:  Days, okay.  I thought you were going to

9   say weeks.

10           We will sort of gauge it, Ms. Seltzer, on those

11  first few days, and to the extent we can eliminate Fridays out

12  of our mind, that is fine.  But if we can't, we can't.

13           MS. SELTZER:  No problem.  I was just anxious to

14  know.

15           THE COURT:  And somebody might mention -- I don't

16  know if we mentioned it to Judge Scanlon or not, but somebody

17  might mention to Judge Scanlon, and William you can pass it

18  along, counsel can double-check on selection day, that not to

19  promise the jurors that they are off on Friday.

20           THE COURTROOM DEPUTY:  I already did.

21           THE COURT:  Did you handle that already?

22           THE COURTROOM DEPUTY:  Just now.

23           THE COURT:  William is a mind reader.

24           Again, I think this time of year is a little -- we

25  have another case that is marked ready subject to this thing,

1  so we don't want to start crowding everybody.  In fact, I

2  think they select before we finish.

3          THE COURTROOM DEPUTY:  I believe so.

4          THE COURT:  I think they select before we finish.

5  It wouldn't be the first time we have had two juries at one

6  time.  It has been awhile.

7          Do we have anything else?

8          MS. WASHINGTON:  Just a couple of other housekeeping

9  matters.

10          THE COURT:  Yes.

11          MS. WASHINGTON:  With respect to movement about the

12  courtroom, would you prefer we ask for permission before we

13  approach a witness or do we have a standing permission?

14          THE COURT:  You can approach the witness.  From a

15  trial strategy, I think people lapse into their normal

16  routine.  I think you all want to do the same thing, rather

17  than stand out.  If Ms. Seltzer lapses into the way we were

18  taught when we were kids, and you don't do it, maybe somebody

19  on the jury sees it.  I think people who have been before me

20  know I sort of let lawyers try their cases, don't save them

21  and don't try the case for them.  So think like that.

22          MS. WASHINGTON:  All right.  Will do.

23          And then we wanted to find a time to test the

24  courtroom equipment.  William has advised.

25          THE COURT:  William, do you know where Judge Scanlon

Proceedings                               32

1    is selecting?

2              THE COURTROOM DEPUTY:  She will be selecting here.

3              THE COURT:  So you will be here on the day before

4    trial.  It will give you a perfect opportunity to test out the

5    equipment.  You will be here for jury selection.

6              MS. ARGO:  Thank you, Your Honor.

7              THE COURT:  Okay.  Anything else?

8              MS. SELTZER:  No, Your Honor.

9              THE COURT:  Give me my memorandum by tomorrow.

10             MS. SELTZER:  Will do, Your Honor.

11             MS. ARGO:  No problem.

12             THE COURT:  Good luck to both sides.  We will see

13   you on Wednesday.  Judge Scanlon will see you on Tuesday.

14             MS. ARGO:  Thank you.

15             THE DEFENDANT:  Thank you, Your Honor.

16             THE COURT:  You're welcome, Mr. Caroleo.

17             (Matter concluded.)

18

19

20

21

22

23

24

25