

U.S. Department of Justice

United States Attorney
Eastern District of New York

CMM:EEA
F. #2016R01958

271 Cadman Plaza East
Brooklyn, New York 11201

December 29, 2021

**EXHIBITS FILED UNDER SEAL**[1]

By ECF and Interoffice Mail

The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:   United States v. Blaise Caroleo
               Criminal Docket No. 17-177 (ENV)

Dear Judge Vitaliano:

      The government respectfully submits this letter, pursuant to the Court's December 8, 2021 Order, in response to defendant Blaise Caroleo's offers of proof regarding alleged psychiatric or diminished capacity in advance of sentencing, currently scheduled for January 7, 2022. For the reasons set forth below, and in the government's October 15, 2021 and December 3, 2021 sentencing submissions (see ECF Nos. 108 and 112), the government respectfully submits that the defendant has failed to set forth any evidence of diminished capacity or psychiatric deficiencies, and the Court should sentence the defendant to a Guidelines sentence of 30 years.

---

[1] This letter and its attached exhibits contain Victim Discovery Material and as such, are governed by the protective order in place in this case. See ECF No. 39. The defendant is not permitted to have copies of the attached documents and excerpted text exchange with a victim in a prison facility. The attached exhibits contain information that may identify certain victims and therefore, with the Court's permission, the government respectfully submits should be sealed on the docket.

I. <u>Background</u>

  A. <u>Defendant's Recent Pro Se Letters to the Court</u>

On December 6, 2021, the defendant, through his counsel, filed two letters with the Court (<u>see</u> ECF Nos. 114 and 115), in which he complained of the conditions at the Metropolitan Detention Center ("MDC"); reiterated his unfounded allegations that the government engaged in prosecutorial misconduct, despite the Court's previous ruling to the contrary (<u>see</u> ECF No. 77); claimed he never wanted to meet with or threatened victims he messaged on Kik; stated Dr. Bardey accurately summarized his lack of potential recidivism and that he should be allowed to have access to a computer when he is released from prison; and alleged he failed to inform Dr. Bardey of his alleged anabolic steroid use.[2]  Notably, the defendant has failed to produce any medical records, psychiatric records or any objective evidence of steroid use and/or its alleged impact on the defendant's mental capacity.

  B. <u>Defendant's Wife's Letter to the Court</u>

On December 10, 2021, the defendant's wife submitted a letter to the Court, in which she stated that the defendant had "gone through some changes in recent years before his arrest."  <u>See</u> ECF No. 116.  She further noted that the defendant had been involved in some car accidents that related to him falling asleep while driving, and that as a result, the defendant "went to a doctor and they gave him steroids to help him."  The defendant's wife did not provide any information about the doctor who allegedly prescribed steroids to the defendant or when this alleged steroid use occurred.

  C. <u>Dr. Bardey's Report</u>

At defense counsel's request, forensic psychiatrist Alexander Bardey, M.D., issued a report ("Bardey") evaluating the defendant's psychiatric and neuropsychological state on October 13, 2017.  In preparing his report, Dr. Bardey reviewed and referred to approximately 11 years of medical treatment records for the defendant, from 2006 to the date of the report.  Dr. Bardey noted that in 2006, the defendant, by his own account, went outside to "scare" some individuals he claimed he caught vandalizing his car. Bardey, p.4.  The defendant claimed he was hit in the head by these individuals and lost consciousness.  The defendant sustained a concussion as a result.  An MRI taken shortly after the incident as well as a follow-up MRI performed several months later showed no brain damage.  The defendant

---

[2] Anabolic steroids are an artificial version of testosterone.  While there are small studies that indicate the misuse of anabolic steroids may cause increased irritability and aggression, other studies have failed to demonstrate such a correlation.  Studies indicate that anabolic steroid users are more likely to report psychiatric disorders such as mania, depression or anxiety.  See <u>https://www.drugabuse.gov/publications/research-reports/steroids-other-appearance-performance-enhancing-drugs-apeds/how-does-anabolic-steroid-misuse-affect-behavior</u>; last visited on Dec. 23, 2021).

underwent a neuropsychological evaluation in 2007 in which he tested within average to low average in all of the administered tests. Bardey, p.5.

In March 2010, the defendant was evaluated again by a neurologist and was found to be abusing prescription medication. Specifically, the defendant's wife reported that he had been regularly consuming four Xanax, Ambien and two Valium to help him sleep. As a result, the defendant had been in six car accidents, had suffered blackouts and slurred speech. The physician noted, "the patient is abusing drugs and overmedicating himself." Bardey, p.6.

On or about December 14, 2015, the defendant sustained an injury to his right bicep and was unable to work on a full-time basis. Bardey, p.7. On or about February 24, 2016, the defendant assaulted a Metropolitan Transit Authority ("MTA") bus driver, because he would not allow him to exit at a particular bus stop. The defendant referred to the assault as a "spat" and told Dr. Bardey that the bus driver stood up and punched him, contrary to the police report and the state's indictment, which names the defendant as the aggressor who perpetrated the assault. The defendant was arrested for assaulting the bus driver. At the time he was incarcerated awaiting trial, the defendant provided a list of medications he was currently taking, including Xanax and Lexapro for depression. The defendant did not state that he was taking steroids.

The defendant advised Dr. Bardey that the defendant began spending more time on his computer at night in late 2015, after he sustained his bicep injury and was unable to work on a regular basis. Bardey, p.7. The defendant told Dr. Bardey he began watching pornography and would send chats on Kik at night when he could not sleep and began drinking at night to help him sleep. Bardey p.8. The defendant told Dr. Bardey he represented on Kik that he was 31 years old. He further explained that he began speaking to teenagers on Kik who had posted about being depressed, but that the conversations turned sexual after that. The defendant also told Dr. Bardey that another male sent him unsolicited child pornography and that he told the male not to contact him again. When Dr. Bardey asked the defendant why he was communicating with underage girls, the defendant told Dr. Bardey that it stemmed from losing his full-time employment and was "an escape from reality." Bardey, p.9.

Dr. Bardey also interviewed the defendant's wife as part of his report. The defendant's wife reported that had a "healthy relationship" with the defendant. She noted no problems with the defendant's behavior until the February 2016 bus assault, when the defendant's demeanor changed to depressed and angry. Bardey, p.9.

Dr. Bardey administered a battery of tests to assess the defendant's neuropsychological condition. On the whole, the defendant scored in the average or low average range on most of the tests, just as he had in 2007. Bardey, pp.11-13. The defendant's personality assessment "indicated a defensiveness about particular personal shortcomings as well as an exaggeration of certain problems." Bardey, p.13.

Dr. Bardey administered a test to determine the defendant's sexual interests. Bardey, p.15. He found that the defendant's results indicated he may have difficulty

3

admitting wrongdoing and may try to justify illegal sexual behavior. Id. Dr. Bardey further noted that the defendant showed sexual interest in 14- to 17-year-old females, as well as adult females.

Dr. Bardey noted no significant change in the defendant's cognitive abilities from 2007 to his examination in 2017. All test results were within normal limits, though on the lower end of the range. Bardey, p.16. Dr. Bardey noted that the defendant's "primary sexual interest lies in adolescent females," id. at p.18, and that the defendant "requires greater insight into why possessing and viewing pornography of adolescents is wrong." He further noted the defendant would benefit from sex offender treatment. Id.

II.     Argument

   A.     Applicable Law

In determining the appropriate sentence for the defendant, the Court must first calculate the applicable Guidelines range, see Gall v. United States, 552 U.S. 38, 49 (2007). Next the Court must examine the sentencing factors enumerated in 18 U.S.C. § 3553(a), which includes the "history and characteristics of the defendant." See 18 U.S.C. § 3553(a)(1). Considering the particular § 3553(a) factors is all that is required; the court is not bound to depart from the Guidelines as a result. See United States v. Jansen, 431 Fed. App'x 51, 53 (2d. Cir. 2011) (affirming judgment and finding district court "weighed the grave nature of Jansen's offense against her alleged psychological impairments, and concluded that a Guidelines sentence" was appropriate); United States v. Fishman, 631 F.Supp.2d 399, 405 (S.D.N.Y. 2009) (declining to depart from the Guidelines where no causal connection between the defendant's bipolar disorder and crime was established).

Section 5K2.13 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") provides that in certain circumstances, "[a] downward departure [from the Guidelines range] may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. However, Section 5K2.13 expressly does not apply to sexual exploitation offenses under Title 18, chapter 110, which includes the defendant's crime of conviction, namely, 18 U.S.C. § 2251(a). See id.; see also United States v. Rosenberg, 423 Fed. App'x 54, 56 (2d Cir. 2011) (affirming the district court's imposition of a sentence at the high end of the Guidelines range for defendant's child sexual exploitation offenses and noting § 5K2.13 was inapplicable).

   B.     The Defendant's Allegation of Diminished Capacity
          Is Based on Contradictory, Self-Serving Statements and
          Should Not Be Considered at Sentencing

The defendant's late-blooming allegation that his alleged steroid use somehow served to diminish his intent to commit the crime to which he pled guilty over two years ago is unfounded. The defendant has provided no evidence to support this hypothesis. Dr. Bardey thoroughly examined the defendant in 2017, and despite the defendant's repeated lies

4

and half-truths, Dr. Bardey was able to determine that the defendant had no cognitive difficulties or serious disorders. In fact, the defendant scored almost the same as he did on similar tests administered ten years prior. Other than suffering from depression and anxiety, Dr. Bardey did not find anything remarkable about the defendant's mental or psychological well-being.

Indeed, in 2017, the defendant did not raise the issue of steroids or testosterone in his interviews with Dr. Bardey. The defendant's wife, likewise, did not mention any steroid use by the defendant when she met with Dr. Bardey. The defendant's wife also told Dr. Bardey that she noted no change in the defendant's behavior until after his arrest in February 2016. Now, in her most recent letter to the Court, ECF No. 116, the defendant's wife stated, for the first time, that a doctor prescribed steroids to the defendant after he was falling asleep while driving and causing car accidents a few years before he was arrested. She claimed the effect on the defendant's personality was "like night and day." Notably, this stark change went unreported in her interview with Dr. Bardey in 2017.

In August 2020, when Probation disclosed the defendant's PSR, the defendant did not raise the issue of his testosterone or steroid use beyond what was already set forth therein. See PSR ¶¶ 126, 132. Indeed, the defendant's own account to Dr. Bardey of his history and characteristics, coupled with his criminal history as detailed in the PSR, indicates that he has been an aggressive individual from an early age. See PSR ¶¶ 103, 108. The defendant's wife confirmed this, calling him "high strung and volatile," noting that he could be violent, nasty and often "does stupid things." See PSR ¶ 119. The defendant's wife referred to her life with the defendant generally; she did not note that there was any sudden change in his personality or decision-making. Id.

On May 10, 2021, over nine months after the PSR was disclosed, the defendant filed his sentencing memorandum with the Court and made no reference to steroid or testosterone use. See ECF No. 107. In her prior letter to the Court, the defendant's wife also failed to mention the defendant's testosterone or steroid use as a relevant factor in his commission of the charged crimes. See id., Def.'s Exhibit F.

In his most recent letters to the Court, the defendant does not allege what effect, if any, his alleged steroid use had on him, such that it caused him to commit the crimes charged in the indictment, or that because of the alleged steroid use, he did not fully appreciate what he was doing. The government has been unable to locate any reference to steroid use causing a sudden interest in child pornography or exploitation, nor has the defendant referenced any such case studies. The defendant cannot establish any connection between his alleged steroid use and his crimes. The Court should not consider this baseless allegation as a mitigating factor in sentencing the defendant. Indeed, the Court should note that this latest allegation is nothing more than a delay tactic to avoid the inevitable sentencing hearing.

C. The Defendant's Interest in Meeting Individuals He Met on Kik

In his recent letters to the Court, the defendant repeatedly states that he "would never meet" any of the victims he met online through Kik. He goes so far as to intimate that

5

such evidence against him is fabricated. In anticipation of trial, the government prepared exhibits from the extraction reports of defendant's phones and tablet that were recovered from his person at the time of his arrest and from the search of his home. One of those devices, which the government referred to as the "Broken Phone" in its exhibit list, contained a text exchange with a victim the government identified as a minor in which the defendant discusses meeting up with the victim, who told the defendant she lived in Medford, New York. The defendant researched the distance between his residence in Staten Island and Medford and discussed with the victim whether she could sneak out of the house that evening or if they would need to find another time to meet up. The conversation is attached hereto as GX 402M.

In another text conversation from the Broken Phone that began in November 2015, before the defendant's injury that he told Dr. Bardey caused him to begin viewing pornography and using the Kik app,[3] the defendant provided his cell phone number, full name and told the individual to call him when she comes to New York. The defendant told this individual that he was "into very kinky extremely wild stuff." This conversation is attached hereto as GX 402O.

The defendant also states in his recent letters to the Court that he never made any threats to the individuals he messaged on Kik. Below is an excerpt from a conversation the defendant had with a girl who told the defendant she was 12 years old:

> Defendant: Now you are going to show me ur pussy or I'm going to show all ur friends the conversation where u said u fucked ur dog . n now I own u
>
> Victim: I never actually did that.. I just said I did so u would leave me a line
>
> Defendant: U have two minutes before I start sending ur words to all ur friends show ur hole now!. Or everyone's going to know wat a pig u r
>
> . . .
>
> Defendant: U should treat people with respect now show me ur pussy. U really don't have a choice
>
> Victim: Did u screenshot the messages yet?
>
> Defendant: Yes y I'm about to send them if u don't send the pic
>
> Defendant: I guess u want me to show ur friends right
>
> Defendant: N the nawty talks under the last name u used

---

[3] In fact, text messages in the defendant's devices show that the defendant was communicating on Kik, and with Jane Doe #1 specifically, several months prior to his December 2015 injury.

6

> Defendant: U need to contact me
>
> Defendant: Stupid bitch u want to humiliate me, u jerk off, o only told one of ur friends he asked to c the conversation. The still have a way out. Before I send out the clips of the conversation m so move quickly os lose big
>
> Defendant: Hey you stupid bitch answer me
>
> Defendant: Weak bitch
>
> Defendant: Last chance to stop me from sending ur words out contact me ur friends are dying to c it so speak now or I'm sending

This message excerpt is attached hereto as GX402P. The government respectfully submits that the words the defendant typed into the Kik app and sent to underage girls is more relevant and revealing of the defendant's true character than any self-serving, unsubstantiated statements he has filed with the Court to date.

III. Conclusion

For the foregoing reasons, the government respectfully submits that the Court should not consider the defendant's diminished capacity argument based on alleged steroid use, as the defendant has provided no evidence that he ever took steroids or that there is any causal link between his alleged steroid use and the crimes with which he is charged and to which he pled guilty.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ Erin E. Argo
       Erin E. Argo
       Assistant U.S. Attorney
       (631) 715-7846

Enclosures
cc: Marion Seltzer, Esq.